RENDELL, Circuit Judge,
concurring in part and dissenting in part.
I agree with the majority that the Pat-tersons have adduced sufficient evidence that the sports equipment ordinance was unequally enforced against them, and that remand is appropriate. I must dissent in part, however, because I would let a jury, on remand, hear the Pattersons’ claims that the other town ordinances were likewise unequally enforced against them.
The majority believes that the Patter-sons must identify with more specificity a similarly situated,person who was treated differently from the Pattersons with respect to each town ordinance. I disagree because I view the instant fact pattern as similar to one considered by the Court of Appeals for the Seventh Circuit, in which the court held that when a state actor treats a person in a truly extraordinary way, a court can infer that similarly situated persons were treated differently. See Geinosky v. City of Chicago, 675 F.3d 743 (7th Cir.2012). In Geinosky, the plaintiff alleged that his equal protection rights were violated by having received 24 baseless parking tickets over a fourteen-month period. Id. at 745. Even though the plaintiff in Geinosky did not allege that a similarly situated person had not received a similar number of baseless tickets, the court found that he had plausibly alleged an equal protection violation, as one could infer that others were not receiving a similar number of baseless tickets. See id. at 748 (“Geinosky’s general allegation that defendants ‘intentionally treated plaintiff differently than others similarly situated’ is sufficient here, where the alleged facts so clearly suggest harassment by public officials that has no conceivable legitimate purpose. To require more would elevate form over substance.”). In other words, the extraordinary nature of the pattern of conduct alleged — amounting to harassment — allowed the court to infer that similarly situated persons were not receiving the same extraordinary treatment. '
Viewed in the light most favorable to the Pattersons, the record here, similarly, reveals an extraordinary pattern of harassment and targeted enforcement of several town ordinances against the Pattersons because of the obsessive, racially motivated conduct of Strippoli.. The majority acknowledges the salient evidence of Strip- *146 poll’s racial animus against the Pattersons, but then downplays the fact that this animus was part of an obsession that a jury could find necessarily resulted in unequal treatment of the Pattersons. Strippoli’s actions in his vendetta went beyond uttering offensive words about the Pattersons. There is evidence in the record that Strip-poli went so far as to (a) threaten the job of a code enforcement officer if he didn’t issue more citations to the Pattersons, see R. 11, 75; (b) take away another code enforcement officer’s access to the town truck for his failure to issue more citations to the Pattersons, see R. 256; and (c) urge the Police Chief to stake out the Patter-sons’ home and then pull over Mr. Patterson for driving a car with what Strippoli suspected to be an expired registration, see R. 338-40.
Witnesses who knew Strippoli testified regarding the extraordinary nature of his actions. A former mayor of Lindenwold testified that Strippoli’s feud with the Pat-tersons was “the talk of the borough hall,” R. 229 — it’s no stretch to conclude that when a councilman’s vendetta against you is the “talk of the borough hall,” you are being singled out for unequal treatment. Indeed, a colleague of Strippoli’s on the town council testified that he felt Strippoli was abusing his power in his treatment of the Pattersons, and that Strippoli was not abusing his power with respect to any other town residents. See R. 148.
A jury could find that his abuse of power manifested itself in the unequal enforcement of the town ordinances against the Pattersons. The majority accepts that there is sufficient evidence of unequal enforcement of the basketball hoop ordinance against the Pattersons, (which, in my view, suggests that other ordinances were likewise unequally enforced — after all, Strip-poli’s obsession was not limited to the Pat-tersons’ basketball hoop), but the majority fails to credit the evidence in the record showing that several other ordinances were also unequally enforced against the Pattersons. Mrs. Patterson testified in her deposition that some of her neighbors had unregistered vehicles on their properties and never received a citation, whereas the Pattersons did receive a citation for that offense. R. 441. Mayor DeLucca testified that he and “half the town probably” had some junk in their backyards, implying that not everyone with junk in their backyards was being cited for it — at least not as often as the Pattersons were. R. 231. Indeed, photographs in the record show many yards in the neighborhood contained junk. See R. 1468-1504; Nov. 23, 2015 Letter from Thomas Bruno, II. By cross-referencing the list of photographed addresses with the list of citations, one can see that at least two other yards containing junk were cited only once and at least one yard containing junk was not cited at all. Compare Nov. 23, 2015 Letter from Thomas Bruno, II with R. 1278-1325. Meanwhile, the Pattersons were cited no fewer than nine times for violating vai’ious rubbish, junk, and abandoned vehicle ordinances. See R. 1278-1325. Perhaps this treatment was unequal — or perhaps not— and perhaps it has a legitimate explanation and was not motivated by racial animus— or perhaps not. These issues are for a jury to decide. I believe they should do so, and therefore respectfully dissent in part.